I'd like to approach the question of whether we have a proposal that I would like you both to approach. Because the cases are parallel in many respects, I thought it would be more efficient, unless there's an objection, to meet their counsel to have the cases received instead of having one case have a way to develop an appellate. But in the same case, since we have your last record, so that you have an appellate in both cases, the first government appellate, you have your full-time visa. So, essentially, I'm going to provide you with a full-time U.S. visa appellate. When you go to 10 and 5, that's what we need to provide. This would mean that you'd have to pay $20 to $10 for all of that. And it's a question of whether you'd have to pay $20 or $30. If there's no objection, you're still in the case. Okay. Okay, there's one other administrative point. I think we don't have, as of now, pages, and I think this is probably true of most of the briefs we have, although I'm not checking them, pages 20 and 21 are provided. Could you provide those pages to the… I don't need them. Well, there's a certain logical gap that if you could just provide the pages at some point to the clerk's office, that's part of the issue. I apologize, I'm overset today. I realize it. Well, I'm over today. Oh, that's fine. Okay. Well, very well. Ms. Christian, is that arranged? Yes, sir. And we do have a complete copy. We have documents and pages in this case. Okay. This is a complete copy. Well, I think what it just says is that we have to submit those pages in any form that's needed to the clerk's office. Very well. Clerk, are your first-hand view numbers 2,007, 5,011, and 5,009? I'm just short-circuiting. Do you understand the arrangement? Yes, Your Honor. May it please the Court, I'm Alan Bennett. In general time, you focus on federal employee overtime and life support. If you deny a challenge appeal in these cases, you will effectively pull the plug on overtime for federal employees and the Federal Employees Pay Act. The appeals demonstrate that employees can't rely upon the good faith of their managers to issue written orders to work overtime. And there's an ingrained expectation that employees will regularly work overtime on the strength of oral orders. And they will not be able to do their jobs well unless they work the required overtime. Overtime which may be required by some document, an oral order, or institutional custody that goes back decades. And yet, in case the appellate claims case, the appellate claims arose under the pre-dead of case law. I don't actually disagree with anything you just said from a policy standpoint. I would think an important job, like a prison official, if the warden says I need you to be here, their word gets denied. And it's imminently important that they do. And that would alter their loyalty and it would ultimately deprive them of rightful payment. And if they were to deny the warden, I imagine there could even be some job jeopardy associated with doing that or possible lack of advancement. I think all the policy reasons you asserted are perfectly reasonable. The problem is OPM issued a regulation. And we have a court interpreting that regulation as not quite reasonable in light of the statute, which is our burden of ownership. I mean, I could give it to the agency. It seems like if you want to make these policy arguments, you actually have to make them to the agency in an attempt to get the writing changed. So that's really not something we can do on it. I understand that the threat of argument today is going to show you how these documents that we've talked about, these briefs, should be regarded as written order. So maybe you apply those and you give deference to the written order, the written regulation. We did not give deference. The Supreme Court already did. The story of the crisis was outlined. I might not have gone that way in the first instance. I might have. I understand. That's right. We've gone with the decision and we're all bound by that. But the point I want to make for us here especially today is this. The court below was unreasonable and unrealistic in viewing the documents, which we regard as causing the employees to work overtime. The employees were caused to work overtime for many reasons. You just talked about one very important document, the program statement, the standards, which informs all Bureau employees that oral orders are as good and as important as written orders. That is the Bible for all of the employees of Bureau prisons. If this document says that an oral order is the same weight as a written order, and you can be found to be subordinate and disciplined for disobeying that oral order, then this document, this program statement, this standard, is a document which should guide your decision in all of these cases. This document should have guided the judge in the court below. It's a document that requires all of the employees to follow oral orders. When the oral order says you will work overtime and you fail to do it, you will be found as subordinate, you will be disciplined, and it makes no difference whether it's an oral order or a written order. That's a paragraph document, which I hope you'll consider right here. Can you talk to me in the appendix to where that document was referred to and how long it took to initiate the formal order and the exact date of the oral order? In the cross of cases referred to on pages 3 and 4, and across the appendix, you'll find it in pages 70 and 71 of the appendix, and 74. The standard manual declares that employees are to obey the orders of their superiors at all times. Can you tell me where it says, what you said it says, where it says that oral orders are to be treated authentically? Because of the table of penalties. The table of penalties? Which is what page? 74. Yes, thank you. It doesn't distinguish between oral or written orders. It says failure or failure to carry out orders, work assignments. There. Insubordination. It doesn't distinguish between written or oral orders. Any order. Oh, but no, there are two different things. I can give you a show. I think they should have been in the appendix. I was going to say, this document correctly says oral orders are to be treated identically to written orders. And that's not true. It doesn't distinguish. You're inferring. Yes, yes. None of the documents says that. You're inferring it from penalties that said you don't carry out oral procedures. Correct, correct. It says order. It doesn't say written orders. It says order. Any order. Any order. This is a very important document. It governs all the employees in these cases. If an employee was ordered to do something that he's not required to do, so the government was taking these actions against him, what I mean by that is, suppose he was ordered to work for five hours in the middle of the night when there's truly a daytime employee, and he declined to do so for whatever reason, do you really think they would then take action against him under this provision? It's not in the job description. It's clearly articulated out. One factual mistake made there. The job description, all the job descriptions in these cases refer to only medicals. I'm not talking about medicals. Medicals. Medicals. I'm saying that I don't think that what you pointed to, if what someone was asked to do was outside the scope of their job, I don't see how the government could pursue penalties against them for that. I think you can very safely assume that the Bureau of Prisons, a quasi-military organization, will take action against an employee who fails to follow any order, oral or written. And if you're given an order, you've got two choices. You either have to obey it, or if you don't obey it, you can grieve it later on, but you have to obey it. That's the standard rule. You have to obey it. If it's an illegal order, you have to follow it. It wouldn't be an illegal order. It would be an order to work overtime. And I absolutely agree with the job description. The job description requires an employee to follow the order. The job description always says that. You must follow the orders of your superiors. So if you didn't follow the order, you would see that case here on the MSPB. The MSPB would have purged a removal action against that employee for failing to follow any oral order to work overtime. It wouldn't be an order to work overtime. I mean, suppose the employee was unable to. Suppose it was a single parent, kid at home, and had no one to watch them. I mean, there are lots of circumstances I can't even imagine. So suppose that there was an order to work overtime, and the employee was incapable of performing. Is that the kind of order for which they could really be reprimanded or removed or refused? I mean, unable to work more than what they ever agreed to do. That seems like a drag to me. You're adding some factors that would distinguish it and ensure that you'll find wardens and associate wardens and captains that say, okay, if you can't commit, we'll find somebody else to do it. Yes. But if you don't have a good excuse, you're going to have to do it. And if you're required to come in and get your keys to the control center, if you're required to do tasks along the way, if the Bureau requires you to talk to inmates along the way, all of these things are required. And some of them, they may not be a direct order saying, you must do this. Why do they have a 30-minute period of overlaps in the morning and not a similar period in the afternoon? Do you have any idea? I didn't know if it came out below or if there were interactions. Well, I can say that. I can tell you why there are overlaps. The overlaps developed in the first Bureau criticism case was brought up in 83. It went from 83 to 96 to 47. At the level of access, you had the very same claims for preliminary and post-preliminary overtime. They issued operations memorandum 214.95. In that case, that's the order, which told them they have to start planning the time of employment, the time they come into the control center, when they start to pick up keys or equipment at that point. It will be regarded as on time at that point. As a result of that, the order also required them to start overlapping shifts to minimize preliminary overtime. So, as I said, you'll just see. Well, I don't think you really mentioned them as a failure to do that in the afternoon shift. You're saying that they were ordered to have some sort of overlap. But it might seem in the back of these cases, Mr. Chenet and others, is that there's an overlap period in the morning shift when the people come. When you're off the next shift, you come on in the morning, there's 30 minutes of overlap. There's no similar overlap at the end of the day when the day shift goes on and the night shift comes on. I'm misunderstanding those facts. You're correct. I don't think that either of these individuals have standing to do that. That is, the union representing not my clients or non-union clients. My clients have no prior experience. The union may have an argument to raise when you want to overlap these to minimize the overtime, but my clients who are managers and supervisors don't have any standing because it's a public bureau. You need to follow up with them or have the people do their jobs differently. The fact that you've got these shifts which are funded against each other and there is no overlap there on two of the shifts, and the result is that you want to do your job well. You're going to have to come in early and you stay late. If you don't do those things, especially to the tenants, the post order, it's very, very quick. These post orders plainly require work before the shift begins. You follow them. You read those things. As a matter of fact, is there anything that prevents any employee from requesting overtime when they've been ordered to work outside their normal work hours? Or that prevents them from requesting the will of your client? There is no rule, Your Honor, but there is an inertia. There is a discouragement. It's very, very plain in the bureau that you follow the flow here. And the bureau is a state that they call a unit. People who show up just at the minute they're supposed to show up, who leave at the minute they're supposed to leave. And the custom, the tradition is you don't question these things. Overtime is not something that you're going to get. You're expected to work overtime without overtime pay. And you can ask for it. But there is a body of an agency that tells you, don't even think about it. So, yes, there are cases where people have asked for overtime. And they can take advantage of that. But the fact is that the entire agency is telling people, don't think about it. And what is the flow being? We've quoted from it here. What is the flow of what? Don't even think about it. Your manager, he is working for you over time. He's going to ask for it. He's putting it out. And so you have a lot of barriers. But there's other public servants that are here protecting us and institutions to guard prisoners, inmates, people who are suspected of crimes, convicted of crimes. And they are very dedicated people who are going to follow the traditions. You don't question it. You do it. I mentioned the standards of conduct, which is paramount here. You have other documents. The training documents that reinforce the expectation that the employee gave you were overtime. There are corrections. The court ultimately found, even with regard to the preliminary findings, that the inmates were committed. Okay. Okay. Well, we disagree, of course, on a lot of reasons. One of the reasons was that they were slicing and dicing the time. You wouldn't consider it entirely speculative. You would isolate a different part of it. If you consider all of the time that the employee, the pension, spent, which is post-preliminary, it amounts to more than 10 minutes a day. If you need to count the time, for example. He testified himself at some point that it took 10 to 15 minutes before he left, basically. Yes, it did. But that included what time when he was already technically off the job? No, he's not off the job. No, he's not. He's within the institution. He hasn't even gotten to the control center yet. We're talking about the time it takes from closing a shop in a lieutenant's office. That requires him to finish up the lieutenant's job. He probably has some work done during the day, but he can't leave until he finishes the lieutenant's job. And then his replacement comes in. He has to give the keys and radios to the replacement. And he has to tell the replacement what's going on. Information is very, very important in the institution. If you don't know what's going on, you don't- And all that is before you're walking out? Yes. And that's all encapsulated in some standard 15 minutes? Yes. And then the walk time is subtracted out? You can't do that. Why is that? Because it's part and parcel of the same work. It's all consecutive. This is not portal-to-portal time. He's within the institution. He's on duty. He's doing his- It's not within the institution, right? Because my assistant leads the desk. And you're the one who leads the desk. You've got to walk to the parking lot. Traffic might take you while you turn right out of the building. And you don't get counted for all that time, obviously. No, no. So, explain to me why that walk time wants to be included. Because normally, walk time means you get to your car in no time. So, that's not what you're saying. I'm saying that this is Baylor. It's Baylor. And for generations it's been held that the time you spend, which is integral to the work- And walking is part of the job, right here, because he's still on the job. He's still required to do things. He's still required to talk to inmates. He can't leave until he passes by the control center. And he's there for radios or batteries. There are what are called 24-hour keys. But those 24-hour keys may enable you to simply retrieve these out of the control center. So, you can't walk out of the institution with those things. It's very secure. So, you are on duty. You're doing things. And then there are camps. There are inmate camps. The post-mortem is referring to the inmate camps. There are camps. And those camps may start around 4 o'clock or so. If you don't have a clear camp, you can't leave. And you may have a clear camp until like 4.15 or 4.20. A clear camp means, verbally, all of the posts have reported to the control center that all of the inmates are in their places and the right number of people are there. God forbid, and I'm paraphrasing one of the witnesses, God forbid you should leave the institution and they found that somebody wasn't there. You'd be toast. So, when the baton is shaved, it is finished doing its work until after he goes to the control center and says, Wait until those guys are done. I'm going. Or he turns in his keys or his equipment and then he goes at that point. Now, what we're talking about now, of course, is part of the shave case that was tried and justified by the court, because it was in the sentence. Yes, sir. Now, in order to understand exactly what a true dispute about the findings made after the trial by the trial court, which they would like to indict, can you tell me exactly which elements of the trial court's analysis at the time were claimed by Mr. Shea, but disregarded by the court, should not have been disregarded? Okay, well, I was trying to do that because... Yeah, but we're sort of talking about it. Here we've got him walking here. I just want to be very sure what... I mean, I think I know what the trial court did. I want to be very sure I understand everything you think of the trial court at all. Okay. But the trial court should have counted, was all the time, 10th, 10th, 10th, starting from the time this... Now, it's your talk, but he's still finishing up his laws. Sometimes there are reports that need to be filled out in the reports. That may keep him ten times. But even if he didn't fill out any reports, he's finished the law. Then his replacement comes up. He has to give keys and radios to the replacement. He needs to brief the replacement on what's going on. Basically, information is vital. Yes, I do a very good job. But that's an element that the trial judge didn't get. He didn't write credit for as much time. Right. But nonetheless, that's time which is credited to Mr. Shea. So you're not going to dispute the question of credit. You're going to dispute the time. But I'm looking for what are the elements that the trial judge disregarded or gathered that you think should have been included. To the extent that he didn't have the walking time, which I'm talking about right here, the time it takes to leave... 3 minutes and 21 seconds he took out. That's what he took out. He said, 3 minutes and 21 seconds for credit, or 60 seconds for credit. Okay. The time that he didn't spend in leaving the defendant's office after he finished briefing the replacement, and then he may be talking to inmates or other employees along the way. He could go through salad court. He could go to the control center there. And you can't leave until there's been a good verbal test. We have a Supreme Court case. It's an easy case. It says that walking into the locker room where you were removing safety gears, safety gears you were required to wear during the job, safety gears you can't take out to the car with you, that walking into the locker room to take out that safety gear off the store is not considered work time. It's not part of the principal activity for which the employee operates. So, again, I'm thinking by analogy, which explains to me why this case makes a difference. I interpreted it differently to say that there's a part and parcel of the main job that someone is hired for, if you count that as work before. In this case right here, we had a shift, a change in the practice. Up to a certain point, during the dependency of these claims right here, employees were, in fact, getting all of their keys and their batteries and their radios at the control center. During the dependency of these cases, they started changing the policy. That's where they started changing it so that the incoming lieutenant would change keys and radios, change the actual lieutenant. That was the takeaway from this control center. The control center has what they call a queue line. The queue line goes to the line there. See, whether it's during rush hour, whether it's in the morning or the afternoon, if it is rush hour, they take you a while to go through the queue line. There may be two people ahead of you or 50 people ahead of you. That saves time. That's the kind of time which should be counted. The operators that are in 242.25 express those counts. That's time. It seems to count that time, it should count that time, because that is time you're spending on the job, and that number doesn't make it clear that now we're going to count your time, 95 on, that you will now count your time from the time you were in the queue line. From that point on, the time should be counted, especially because up until a certain point, around 2004 or 2005, the employees did have to get their radios and their keys at the control center. They couldn't go to their duty post without those things. You needed to have the keys to open up secure doors. You needed to have a radio for security purposes and safety purposes. You didn't have the radios. The trials are back then. The key exchange radio was for five minutes. We disputed that. That was in the Shea trial. It could be minimized for this time. But that was after having heard witnesses from both sides and accrediting the testimony. So there's five minutes. I think in the Shea case, it's, what, one and a half minute walk from the court panel. I believe that's right. So the extra time beyond that six and a half minutes, that you say that the court has started, is exactly what? I just want to make sure that I know where and how much extra time you're counting. Okay. I can't give you the exact equivalent, but we submitted to the court below an outline which identified that the separate measure of time and perhaps we'll be able to find that for you in the appendix. But we had a chart that we told the executive committee that they need to understand that the... Counsel, can I move you over to something a little different? Which is, one of the arguments that you made in Shea that you need to... Excuse me, Mr. Tucker from Shea, I don't know if his name is right. Tucker from Shea. Okay, from Shea, okay. One of the arguments you made in Shea related to the receiving of cost time in lieu of overtime payment for the following week? Yes. Okay. And it wasn't set in a brief, and I realize that we'll be able to do this before we issue the case, but we should get another bill in the case. We have to see if we're doing those. Jane Doe, and then we have another case that came out just in January. In fact, I said, Bryce and I want to have it, so it didn't escape my observation, but unless in that case you complain that it costs time to accept a one-to-one, you need to make that choice to accept a one-to-one, and you give up, and that's your choice to make, but you make it and then you give it up, so I assume at some point, hopefully, you've come across these cases in preparation for oral arguments, and I'm hoping to do a public hearing like this to recognize what's going on with regard to our own position on this issue. The issue is that you should not make that retrospective, retroactive. At the time, the only time it occurred here, there were some instances where the employees were given the option, but in some cases, there was no option. It was mercifully said, we'll give you time, and that's it. I'm sorry. I don't believe that our case actually says that giving an option is required, but I think you can do that to try to get it out of the way. What I'm saying is that the fact of the BOP cases here, the Carlson and Shea cases, and the cases we've had of them, is that there were times where management said, we'll give you the option, but most of the time, there was no option. Management said, give me a time. So, we fill out this form. When we give you the form, you fill out the form, you get the stop time. And so, you get hour after hour, and you don't get anything for the time, for the hours you were focused on. That was what happened. So, is there evidence in the record that they were... Because, in fact, my recollection was that they were given an option, that they were given the option of selecting a comp time or overtime, and it said, for example, Mr. Shea's case, there were seven attempts that he attempted outside of the door. What I'm saying is that in all seven instances, he was given an option. Now, if I'm misremembering or misunderstanding, I'd love you to point me in the record, but maybe there's a distinction that has to be drawn with our president that possibly our negotiate will allow for such, but I didn't find any evidence in the suggestion that he wasn't given an option. So, if you encounter it, maybe before rebuttal, you can let me know. But, apart from that, the one question I have for you is with regards to Mr. Shea and the seven who attended meetings, I understand that he had post-orders that required him to attend to the car lot, to attend those room drivings. Now, you're sitting right here below how those bills were written, what are the meeting standards? You know, and they were cumulatively, and I want to emphasize that whenever you look up in these documents, please view them cumulatively because in the real world, the managers and employees view them all cumulatively. It's a law of the shop. And cumulatively, you've got a lot of documents which require them to attend these meetings. You have institutional supplement in each institution. And they say the trans-media meeting has to be held at a certain time. The department meeting has to be held at a certain time. And there are combined trans-media and department meetings at certain times each month. Those are stated in the institutional supplement that goes after all the employees. Let me interrupt you. I definitely understand all of your arguments about the rest of the documents, but what I wanted to get at was do you have a written order that says he must attend? By the way, that doesn't matter to me. Then, you have that option. And then, if he didn't attend, and I know you didn't attend all of the courts, which I know is how long the restraining case is, which I probably shouldn't think, but those are the same seven for which he did receive comp time. That's the crucial factor. He did. The court may not have effectively treated me as entitled to overtime, but he did, in fact, get comp time for those seven. Yes. Right. Yes, sir. Your argument is that you would like that to be understood. Yes, it is. I just have to say that the reason we say that is because in the briefs, and today, we asked the court to reverse the report below and proceed with further proceedings below. Thank you. Great. May it please the court, the trial court has correctly applied this court's decision in the overtime and regulations that we have applied 3-5-5-15-21-16. Mr. Currie, just moving into this conclusion, I want to put it out there. No case in this decision has opened up the prospect of fees and I think Judge Morris' question early on outlined the confusion that gives itself up to the practice that there can be pressure. The oral practice never puts a point on employees to work in that off the clock practices that employees have tried to present. What's the remedy for an employee who has been in those circumstances? When the employee is told, yes, you have paid our shift, but you are expected to be here for an hour and a half without being approached. An employee presented to that situation does have the protection that's provided in your prison guidance which is in this. It would be in both dependencies but I'm citing to the Carlson appendices at page 52 and this is a directive on penance and leave and it states that the chief executive officer or the designated must approve and advance the granting of overtime  time. So the chief executive officer would be your warden or an expressly designated official by the warden. So absent having that, the employee has to have an order coming from the warden or someone that the warden has given the authority to, then the employee would not have to follow that. So the warden gives an oral order saying the warden says be here 30 minutes or what's the employee's mandate? In that case, the employee either does what the warden says or he doesn't. Consequences would follow. But he doesn't presumably enter the community. Depending on circumstances, that could very well be. If there's an emergency situation, I'm sure... Let's assume it's not an emergency. Let's assume... I'm trying to see if there is any remedy for someone who is basically told over the long term... I'm not referring to emergencies or emergencies at the moment. Over the long term, you're actually going to be working 45 hours a week, not 40 hours a week. And we want you here early and we want you to stay late. What's the remedy for somebody that's in that kind of world? He can request any time for his services. Right. Which is not tied up with his government specifications. Under this regulation, he would not be absent. They've written order or approval. He can request something that's correct. What can he do by way of request? He can request to work full-time. He's trying to do this to perform the work. But I think the system here does depend on the growth rate of government employees. And there was extensive testimony in the record, both at the trial and in the depositions that were taken that are part of this   I think it's important that the Bureau of Prisons does compensate employees when circumstances do require them to work full-time. Why in the world do they institute a policy of 30 minutes of overlap in the morning shift? Obviously, they don't have to connect to their shift. The overlap is from 730 a.m. to 8 o'clock a.m. And this is the overlap between the two operations. So, necessarily in the morning, why isn't it necessary in the afternoon? Is there a difference in terms of what they must do in the transition time? I think what you're missing is that it did not arise from a necessity of having two people working at the same time. It came about because of the one-hour break. The only people that had the one-hour break that the operations would have was the day shift. They worked eight and a half hours and got up at seven thirty a.m. to four o'clock p.m. Now, what I would also point out to you is that when the schedules were changed by Captain White, he arranged that there would be only at least a five-minute overlap between the shifts. And that was one thing that was necessary. He pointed to the changes he said by the captain which said only five minutes as opposed to half an hour. I'm not sure I can answer your questions. Go ahead. Mr. Butler. He asked a question earlier. There was a need that it was a culture over time. There was an expectation of over time. But they ground it onto an omitted factor. According to his argument that, long ago, it was a little bit unusual that the government expected over time and over time it was not compensated because it was not right. But it is your position that, in fact, the evidence that has been produced in these cases refutes that, because there isn't in fact any evidence that the judge over time expected on these very small orders. All of those protections are refuted on some judgment papers. The court did not find it necessary to make a factual finding on the results of their judgment papers. When we put into evidence, factual evidence, other evidences, including the evidence we testified in that position, they also testified in charge that it was their policy to compensate people for their actions. The  did not find it necessary to make a factual finding on these very small orders. The court small orders. The court did not find it necessary to make a factual finding on these very small orders. The court did not find  necessary make a factual  on these very small to make a  factual  on not find it necessary   a factual finding on